I think we're all settled, Mr. Whittle. Good morning, Your Honor. May it please the Court. I'm Matt Littleton representing the United States. This Court should reverse the trial court's award of $4.2 million to Lost Tree for a regulatory taking of Plat 57, a five-acre tract of wetland swamp and submerged lands that Lost Tree purchased against the backdrop of existing regulatory restrictions. I'd like to start first by explaining why this was not a categorical taking under the United States. Can I ask you about that point? Because that is a recurring point that you make that comes up in the briefing. But it's my reading of Palo Zolo that Lost Tree is able to recover for lost value, even if they didn't buy the property until after the regulatory scheme was enacted. Am I misreading that case? Palo Zolo stands for the proposition that it is not a categorical bar to a takings claim if the claimant acquired the property after the regulatory enactment. And we're not suggesting that it is a categorical bar. What we're first suggesting is that a claimant may not always recover in such circumstances. That's the Lucas analysis. And then second, under the Penn Central analysis, in the circumstances of this case, we argue that the three Penn Central factors, when considered as a whole, weigh against a finding of a regulatory taking. But I'd like to point out, because Your Honor brought up that case, that what really the dispute in this case comes down to is an argument that is encapsulated in the dispute between Justice O'Connor's concurrence in that case in Palo Zolo and Justice Scalia's concurrence. Justice Scalia's concurrence, which writing only for himself, suggested that it should make no difference whatsoever if a property owner acquired property after the enactment of the regulatory regime. Justice O'Connor, however, pointed out that that rule would give rise to windfall, such as we have in this case. And that view was joined by the four dissenters in Palo Zolo and later enshrined into the majority holding in Tahoe Sierra, which extensively quoted Justice O'Connor's concurrence for that proposition. So the suggestion that Lostry makes, that it should make no difference whatsoever, that it purchased the property after the regulatory regime, has been squarely rejected by the Supreme Court. But I want to go back to first explaining why Lucas does not apply. Are you saying that Tahoe Sierra overruled Lucas? No, not at all. What Tahoe Sierra did was explain what the rule in Lucas meant. But Lucas is still just law. Absolutely. Lucas is good law. And what Lucas said, there were two alternative formulations in Lucas. One was that it matters that there is total loss in value. In Lucas you had a finding that the court accepted as a predicate finding for its holding that the property was rendered literally valueless, i.e. zero dollars. That's certainly not what we have here. The second framing in Lucas was that there was no economically viable use available to the claimant in that case, who had bought the property for roughly a million dollars before the regulatory regime was enacted. Here what we have is a trial court finding that the property was worth $27,500. But you don't read Lucas as requiring 100% necessarily, right? Well, you certainly don't need to reach that point in this case. Well, I think you do because we're pretty close to 100%. Isn't the calculation here 99.4%? Under the trial court's finding, yes, and we disagree with that finding. Okay, but let's assume we accept that finding. Assuming we accept that finding. So we're getting very close to whether or not you've got to be 100% or anything less than that defeats the categorical taking, right? You don't read Lucas as saying you absolutely need 100%, right? Your Honor, under this court's holding in Cienega Gardens, no percentage diminution in value short of 100% necessarily results in a taking. So we would argue, in fact, that even if it's 99.4%… But any residual value here, it's only to preserve the environmental ambience of the entire development. The residual… There's no economic viable use left in the property. I go to Lucas at page 505 U.S. at 1016 where Lucas explained that the question is whether the owner is left with an economically beneficial use. And this court has interpreted that in RIF and Meritrans, RIF Energy and Meritrans, to say that in determining when a taking is categorical, the owner's opportunity to recoup its investment or better cannot be ignored. In this case, the only demonstrated investment that Lostry made in flat 57 was the $5,370 purchase price. Even accounting for inflation, the remaining value in the property is sufficient for Lostry to more than recoup that investment. That here is the economically viable use, which certainly was not present in Lucas. And I would point out that this court… So let's say that we accept that 100% loss is sufficient under Lucas. What about 99.99%? Again, Your Honor, it would depend on the facts of the particular case. If the owner had purchased the property for a pittance and was still able to more than recover its investment, then no, that would not be a Lucas taking. In this case, again, we focus on the economically viable use of sale, which Lucas itself recognized that sale was an economically viable use. This court has repeatedly recognized that in subsequent cases. Here, again, the only demonstrated investment in the property was the initial purchase price, and Lostry was able to more than recoup that cost, even subject to regulation. So that is why, again, I'll encapsulate our position on Lucas. Your argument regarding the expected investment in the plat, that relates only to sale, a potential sale of the property and value. So are you arguing that we should restrict Lucas to only value that will result from a sale? What about the use of the property? Well, again, Lucas applies when all economically beneficial use has been withdrawn from the property. There are many possible economically beneficial uses of property. All we're pointing out in this case is that there's… But didn't the CFC here find the property had no economically beneficial uses but maintained the value of $27,000? The CFC found that, but the CFC did not consider the possibility of sale, which we pointed out in our briefs at that point. And the CFC needed to consider the fact that, as this court held in Ruth Energy, in determining whether a taking is categorical, the owner's opportunity to recoup its investment cannot be ignored. That is because sale is an economically beneficial use. To be sure I understand the government's argument. Are you saying that there is no taking, there can have been no taking because of all of the circumstances and the expectations, the investment-backed expectations when the property was initially acquired and so on? Is that the government's position, or is it a matter of evaluation? Your Honor, our position as to Lucas is that it is not a categorical taking. In other words, it is not always a taking. All right. So then we go to Penn Central. We get into the Fifth Amendment whether it's categorical or not. Is that right? Well, the question is, first of all, in terms of whether it's categorical, is the two alternative framings in Lucas are, is there value left in the property, which, again, the court echoed in Tahoe Sierra, the focus on value. And second, is there economically beneficial use? Here there's unquestionably value remaining in the property, and there's economically beneficial use in the form of the ability to sell the property. But what value is compared to what? I mean, in here the only value is that people get to look out and see the wetlands. And I guess that that provides some sort of aesthetic, environmental, healthy ambiance of the entire reserve. But what does that do to law enforcement? There's no value in that to law enforcement. The only intended use of Plat 57, as this panel found in its earlier opinion, was sale of the property. Wall Street never intended to use this property for itself. This is a development corporation that intends to use the property only for sale. Our point is that it could sell the property for more than its demonstrated investment, and, therefore, that is an economically beneficial use. Therefore, that takes us out of the Lucas framework. I'd like to turn to Penn Central, where we start with the absence of reasonable investment-backed expectations. As this court noted, and as Wall Street openly admits, it had no investment-backed expectations for Plat 57 at the time of purchase or for decades thereafter. Wall Street has not cited any case that would suggest that its later arising expectations are cognizable under the Penn Central analysis. And, at any rate, under this court's decisions in Good, Norman, and elsewhere, those expectations do not count. I'm not totally convinced by that argument. I understand it. But if you have a developer, and the developer says, I'm going to develop all the acreage except for three, and I'm going to leave one for green land, another for a playground. And as they're going through development, they're getting close to the end of it. Then they decide, I'm going to use this remaining acreage to build another home. I mean, it just seems to me that a development is a development as a whole. Why isn't that the case here? Well, again, Wall Street purchased the property after the enactment of the relevant regulatory regime against the backdrop of needing to get a permit. And in this case, this court has held in Norman that when you purchase the property after the enactment of the relevant regulatory regime, it is particularly difficult to establish reasonable investment-backed expectations. The only evidence that Wall Street put forward that the trial court credited about developing those expectations was the permit that was granted for Plat 54. But as the court found in a finding that is binding in this takings case, the Plat 54 decision was – in the Plat 57 decision, the court said that we understood as part of the Plat 54 decision that there would not be further wetland development in this community. And therefore, there was a practical alternative to Plat 57. And so we're not saying that there is no circumstance in which a developer could show reasonable investment-backed expectations. What we're saying is Wall Street hasn't shown them here. I guess I'm a little unclear. Assuming you're arguing that it was against the backdrop of regulations that were already in existence, do you think that matters? Is it your view that there can't be changed circumstances that would raise what were initially the reasonable-backed expectations? Our view is not that there can't be changed circumstances. Our view is that there are not changed circumstances here. Wall Street hasn't pointed to anything that would justify changed circumstances in light of 2001 developments. And again, this court – neither this court nor the Supreme Court has ever considered these later arising expectations. But what about the development of wetlands and some of the adjoining developments? Again, the development of wetlands and the adjoining developments, each project is considered on its own merits. Isn't that a change of circumstance? You have a developer who looks across the river and sees that the adjoining development is getting permits to develop wetlands, and their expectation changes at that point in time. We have some valuable land here. Plat 54, when Wall Street, its spinoff company, obtained a permit for Plat 54, there was a survey of the surrounding land. And it was understood at that time, according to the court, which again, that finding is binding here, that that would be the last piece of development in the community. When it turned to Plat 57, the court explained that again. It said, look, you've had reasonable use of the property or your property as a whole. There's a practical alternative, which is the existing lot on Plat 54. I would also point out that in addition to being distinct and reasonable, they need to be investment-backed. And the trial court didn't make any findings as to an investment made in the property during that time. Wall Street had ignored the property entirely, as this court noted in its earlier opinion. And so, as this court said in Cianica Gardens, there needs to be a nexus between the investment and the expectation. There was no such nexus here. I see that I'm running into my rebuttal time, so I'd like to reserve the remaining time. Thank you. Good morning, Chief Judge Rost. And may it please the court, I'm Jerry Stock, and I represent Wall Street. This case is not nearly as complicated as the government would make it. In the court's prior decision held that the only relevant property is Plat 57. Isn't it an odd result? I mean, what prevents someone from buying highly regulated land? And let's assume people, normal reasonable people, would only place the likelihood of them being able to get a permit at 5%. Is that still, when the permit is denied, is then there a takings case? And if, in fact, the regulation takes all economically beneficial use, they get paid by the government? Your Honor, the government threw up that bugaboo as early as Loveladies, as we explained in a footnote in our briefing in the prior appeal. It's never happened since then. It's not this case. If there is some kind of abuse like that, the facts will lead to a proper result in that case. That's what led the court in Loveladies to say that it takes a flexible approach to the relevant parcel question. And we explained that in a footnote, if you go back to the Loveladies decision, where the same parade of arguments… Why is that a bugaboo that nobody could consider? How is this case that different from that case? I mean, there were no expectations. At some point late in the game, they said, let's go try and see if we can get a permit. I don't know what the chances were that they were going to be successful in that endeavor, but let's assume. I don't think it's that much of a stretch to say their chances were at least no better than 50-50. Your Honor, it didn't happen here. The court's prior decision has already established that this parcel was entirely ignored for 30 years. This is not a developer that was lying in wait to take advantage of… Okay. That's established in this case already. Okay, so with lying in wait, no one had any basis for thinking that they could get a permit or develop this land. And now let's assume a reasonable person would say, well, there's a 25% chance that I could get a permit, so I'm going to go for it. And then if the permit is denied, the government's going to have to pay me if there's no residual economic use. How can one think that there was no basis for a permit? There have been four 404 permits that have been – this entire development, this was 20… Well, what is the standard in your view under the law for the expectations with regard to whether you're going to get a permit to prevent what we all think would be unreasonable windfall under certain circumstances? Well, first of all… What are the odds? If the odds are only 10% that you get a permit and then you're denied, there's no taking? But if the odds are 90% and then you get denied, that should be a taking? I'm not sure I understand the question, but in this case, the trial court found as a fact that Lostree had economic expectations for this parcel that were distinct. And this court relied on those expectations as the basis for its prior decision. And so to say that they weren't reasonable – they were reasonable because of prior permits that Lostree had obtained. They were reasonable because of the Platte 54 permit for home sites that were obtained. They were reasonable because another permit was obtained by another owner inside the community that Lostree was aware of and, in fact, its consultant had worked on. This is all in our brief. There were a number of factors. We had been encouraged – Lostree had been encouraged by the state agency, the St. Johns River Management District, to go find a site-specific parcel to use these mitigation credits for, which is the way the whole sentence starts. There were a number of factors that the trial court relied on in finding distinct economic expectations for Platte 57. But the problem, it seems to me, isn't the economic expectations, but you – all of the cases talk about investment-backed expectations. And my understanding is that no investment had been made. It was all expectation. I think that's not correct, Your Honor. What was the investment? The investment was in the – we had applied to the town of Indian River Shores. We had obtained preliminary Platte approval. We had obtained a determination that these were marginal wetlands. That had been litigated. Some of the adjacent landowners – this is all in the prior decision. The adjacent landowners complained. They said it's not marginal wetlands. The state court ruled in a final decision that these were marginal wetlands. We litigated that. We had developed the – Mr. Mulchory had put together a development budget for what was going to be done here. And so the – I mean, the planning had been done. Every other permit that was needed to put a home site on this parcel had been obtained by lost trace. So there were – we were absolutely ready to turn the shovels if this permit had been granted. And a lot of preliminary work had been done. And this – on later arising investment fact expectations, it leads to anomalies. I mean, does that mean inherited property can never be the subject of a regulatory taking? Circumstances can change, as Judge Raina said. I'm sorry, Your Honor. Going back to the application, the permit application process and the different litigation you were talking about, I don't recall that there was an actual number. Are you able to tell us exactly what the permitting cost was for you? There was no finding about that by the trial court. There is in the trial record this budget that Mr. Mulchory had put together, which the appraisers relied on. I think it's talked about by Judge Leto in his first decision, his first post-trial decision, that Mr. Mulchory had put together this development budget, which included filling the land and clearing the wetlands and, I don't know, putting in footings. I mean, I don't remember everything that was in there, but it was about $400,000 or $500,000 of budget for the development. But if I may go back, as I started at the outset. Let me follow up with another question. Under Lucas, what's your view? What's the emphasis? Are we looking at value or use? It's use, Your Honor. The government made the same argument in Lucas that – let me take a step back. It's use. And let me say a couple of things before I get specifically to why I know that about Lucas. In this case, this trial court found as a fact that there was no economically viable use, as Judge Prost pointed out. Both parties' appraisers testified that there was no economically viable use. The quotes are, I think, revealing. Let me see if I can find those quickly. Lostry's appraiser, quote, no economic use except at nominal levels related to nuisance value or environmental use. That's in the trial court decision A-8. The government appraiser testified that, quote, the highest and best use without the permit is, quote, a place to go for relaxation to enjoy nature, close quote. That's at A-1825. That's in our briefs. Both parties testified there was no economic use. The trial court found there was no economic use. And the government didn't – But Lucas uses the word value. It does, as Mr. Littleton said, in one, quote, formulation. But the key to Lucas is the lack of economically viable use. There's a good discussion of this in the PLF's amicus brief. All land has innate value. All land has innate value. To say it has to be zero would swallow the Lucas rule because even land that's dedicated for conservation is assessed for positive value for taxation. And in any event, the 27 – you know, the 27-5 finding was a nominal value. So the government relies on RIF. Pardon me? The government relies on our opinion on RIF. Yes. What do you think of – do you think there's anything in RIF that would tell us? RIF was a – RIF, they rely on – the government relies on RIF for this idea that the value today is more than the purchase price 40 years ago. That's not the test. The test for a taking is the value that was taken by the regulatory action against the value that remains. I mean, that's been the law since Keystone, at least, or going all the way back. That's what this court directed the trial court to do. So the explicit remand instructions in this case were to, on remand, quote – this is from this court, 707 F. 3rd, 1295. On remand, the court first should determine the loss in economic value to Platt 57 suffered by lost trade as a result of the permit denial. That's what taking's law is all about. That's the whole purpose of the relevant parcel inquiry. Again, back to Keystone, Supreme Court, because our test for regulatory taking requires us to compare the value that has been taken from property with the value that remains in property, one of the critical questions is determining how to define the unit of property whose value is to furnish the denominator of the fraction. So once you determine the denominator of the fraction, which is Platt 57, which this court did in this case, the only thing left to do is to compare the value that was taken with the value that remains. And it's undisputed that it's 99.4 percent. No, no, the dispute is whether or not 100 percent, which even your friend recognizes is not necessarily always the rule. Let's talk about the 27.5. First of all, if this isn't a taking under Lucas in Penn Central, then those cases have no meaning. In Sienega Gardens, this court found as a matter of law that a 96 percent reduction in value was a Penn Central taking. But let's talk about the 27.5. It's a nominal value, not real. The Arab appraiser assumed – he said, I couldn't find any comparables. This land is – land like this is not really bought or sold. There was no – and so he assumed. In his experience, he said – you can see the testimony in our brief. In his experience, the nominal value of land is between zero and one percent of its developed value, and he assigned – the trial court uses that word, the assigned value of 27.5. It's a nominal value. There was absolutely no evidence at all, and not even an argument by the government. This is another point I want to make. Was there any evidence that somebody would want to buy the property? The government first raised this argument on appeal that sale is an economically viable use. It was never argued in the trial court, and the best evidence of that is at A4 from the Court of Federal Claims in Judge Leto's decision, quote, the parties agree that without the permit, Plat 57 has a nominal value not reflective of any economic use, close quote. The parties agree on that. It was never argued below. Sale is not a use, and plus, there was never any evidence of sale. There was never any argument of sale. As the PLF also points out in their amicus brief, in Lucas also, they quote the government's Supreme Court brief in Lucas. They argued that, well, this has some use as environmental value and so forth, and of course, that didn't forestall the holding in Lucas. So back to your question, Judge Arena. It's use of land. The only thing that can be done with this parcel, this is in the middle of a residential community. It's zoned for a home site. Without this permit, this land will be barren forever. There's nothing that can be done with this land. If that isn't a Lucas taking, then Lucas has no meaning, and it's certainly a 10th Central. It's a categorical taking, and there's no use to go to the 10th Central. No, Your Honor. I argued in the alternative to Judge Leto, and he made findings in the alternative because I foresaw where we are today, which is that the government would be making arguments on both. And I think it is appropriate to have alternative findings, but Lucas ought to carry the day here. It really should carry the day. If zero is the test for Lucas, zero value, the only Lucas takings will be at hazardous waste sites that have negative value because all land has some innate value. Even in Lucas itself, I think the facts, not in the decision, but the way things played out in Lucas, I think the restriction there was later lifted. And Mr. Lucas was actually able to build on, I think. I'm not positive about that. In considering the 10th Central factors, is it the case that, for example, the reasonable expectation of investment, the argument that the government is making today, has already been made and decided? I'm sorry, the reasonable – That the factor dealing with the reasonable expectation of investment, that that's an argument that's being made to us today, but it's an issue that's already been decided. The Court of Federal Claims found as a fact that Lost Tree had reasonable economic expectations for this parcel. This court relied on those distinct expectations as one of the crucial components of the decision, the prior decision, to say that this is a distinct parcel of property. And so – So what do you see as applying here, the law with respect to that issue? The law of the case or the mandate rule? Well, I wouldn't limit it to those two. I think it's already been decided. It's already been relied on by this court. And it's, in fact, not clearly erroneous as a matter of fact finding by the trial court. The government hasn't – I don't believe even argued that it's clearly erroneous. There are all these factors that I mentioned earlier today that would have created reasonable expectations. And in any event, at the end of the day, Judge Leto said it was a wash. He said it favored – this factor favors neither party. What's crucial here, even under Penn Central, is the overwhelming economic loss. And that quote from Lingle that's also in our briefs, that, quote, the Penn Central inquiry turns in large part, although not exclusively, upon the magnitude of the regulation's economic impact and the degree to which it interferes with the legitimate property interest, 544 U.S. 540. You know, okay, there is a permitting scheme here. Judge Leto recognized that. He said, look, they've got distinct expectations. I found that after the trial. But there was a permitting scheme. This factor favors neither party. Character factor, he said, loss tree was singled out. The trial testimony and his finding was that if another landowner had applied for the same permit, it would have been granted. Character factor favors loss tree. But the overwhelming factor under Penn Central is the economic impact, which at an absolute minimum is 99.4 percent wipeout. And I would submit to you that under the Lucas test, or a position certainly is, that there's no economic use here. The trial court found that. Both appraisers testified that. And this should be a Lucas taking as well. So the trial court should be appointed. Thank you. Thank you, Your Honor. I have very little time and several points to make. First of all, on whether we raised the economically viable use of sale below A34-36. The record makes clear that we did. Secondly, as to the flexible approach that the court cited in Loveladies that counsel referred to, what counsel is arguing for here is an inflexible approach under Lucas in which there would be a categorical taking, regardless of the investment made in the property. That would make essentially the just compensation clause a guarantor of lost profits for developers like loss tree. That's inappropriate under both the precedent of the Supreme Court and this court. Third, regarding the supposed investment made in the permitting process, there were no findings made on that point by the trial court. I'm not sure exactly what counsel is referring to here. There was certainly nothing in loss tree's brief regarding proof of investment. Loss tree bears the burden to demonstrate the investment. And as this court did in forest properties in Seaver versus United States, it should hold that loss tree failed to carry its burden to demonstrate either the economic impact or investment-backed expectations and dismiss the case. If you're arguing value, don't you have a burden to show what the value would be if there's actually a sale? Well, that was a finding of the trial court, which is that the fair market value was $27,500. That's what that standard means under the law. And so there was this idea that, well, loss tree never had an offer to purchase the property. Well, that's because it was never put up for sale. The value, as both parties accept. That's with the land being undeveloped. That's with the land being undeveloped. That's right. That was a finding of the court. And finally, regarding the trial court's findings as to reasonable investment-backed expectations, the only thing the trial court relied on was, number one, the fact that it had gotten permits from another entity. And we explained in our brief, loss tree hasn't contested, that the standards for granting permits are different for the state and federal in that case. And also, the other thing the trial court relied on was the flat 54 permit, which is explained in my opening argument, did not give rise to a reasonable expectation. I'd like to close by saying that what we have in this case, again, is a $4.2 million award for a property purchased for $5,000 and then, according to loss tree, forgotten about for 30 years. If this court awards a taking in that circumstance, it goes against, again, the principles of fairness and justice underlying the just compensation clause. It goes against Tahoe Sierra, Justice O'Connor's concurrence in Palo Zolo in that case, and we ask that the trial court be reversed. Thank you very much.